**PATTERSON et ux. v. CHICAGO, R. I. & P. R. CO.**

**No. 5394.**

Court of Appeal of Louisiana. Second Circuit.

April 1, 1937.

Rehearing Denied April 30, 1937.

Writ of Certiorari and Review Denied June 21, 1937.

Truett L. Scarborough, of Ruston, for appellants.

Barksdale, Warren & Barksdale, of Ruston, for appellee.

TALIAFERRO, Judge.

Plaintiffs sue to recover damages alleged to have been sustained by them because of injuries, resulting in death, suffered by their daughter, Imogene, when the automobile in which she was riding as a guest passenger collided with a flatcar of a train of defendant's in an intersection in the town of Ruston, La. They appeal from judgment sustaining exceptions of no cause and no right of action interposed by defendant, and the dismissal of their suit.

The allegations of the petition, so far as are needful to a discussion of the merits of the exceptions, read as follows:

"4. That U. S. Highway No. 80, also known as the Dixie-Overland Highway, is a much traveled concrete highway, running east and west through the town of Ruston, a town with a population of approximately 5000 people, and crosses the main line and four switch tracks of said Railway Company paralleling each other in the said town of Ruston, and creating at said point a dangerous crossing covering a distance on said highway of about 107 feet from the outside rail to the outside rail and running east and west, and that said highway at the point of said crossing is about 37 feet wide from curb to curb.

"5. Petitioners show that on or about September 1, 1935, said Railway Company, through its agents and employees, installed an electric automatic signalling system at said crossing consisting of a combination bell and lighting system constructed in the manner hereinafter set out:

"A steel pillow or post about 13 feet high having large crossbars at the top with the word 'Railroad' on one and the word 'Crossing' on the other, and just under said crossbars 6 large red lights, the top lights being 9½ feet from the ground and the bottom lights being about 6½ feet from the ground, each light being 7½ inches in diameter, said lights being arranged in the form of the letter 'T', with 4 vertical lights and two horizontal lights, and with the switches controlling said lights so arranged that when the said lights are on, the vertical lights remain on continuously and the horizontal ones alternate in coming on and off, giving the appearance of a large red arrow pointing first one way and then the other; said lights when burning can be seen at a great distance away; and that inside of said post or pillow is located a bell that gongs continuously while said lights are burning and which can be heard for a distance of 3 or 4 city blocks away; the system consisting of two such posts or pillows, one placed a few feet east of the outside rail facing the east and a few feet from said highway and having placed on it between the crossbars and the lights, about 10 feet from the ground, a large sign with the figure and word '5 Tracks' on it and being made with material that very effectively reflects lights and causes the figure '5' and the word 'Tracks' to stand out very prominently when light is focused on them, and the other post or pillow placed a few feet west of the outside west rail of the third track facing the west a few feet from said highway and being exactly like the first described pillow or post, with the exception that the sign on it reflects the figure and word '3 Tracks', instead of the figure and the word '5 Tracks'.

"6. That when the above described signalling device is in operation at night, it is very effective and very prominent.

"7. That there are no permanent lights maintained at said crossing, though it is a very dangerous one, being the intersection of said railway and a much traveled national highway in a populous town on a grade and within the switching yard of said Railway Company in the town of Ruston, Louisiana, where much switching of railroad cars is done by said Railway Company in the night time.

"8. That said automatic signalling device constructed at the said crossing was put in operation on or about September 1, 1935, and through its operation to March 31st, 1936, lulled and misled the public, familiar with said crossing, and especially your petitioners' daughter and L. D. McClung, into believing that so long as the lights were not burning and flashing and the bell not gonging that the crossing was clear and safe and that, it was not until a horrible accident occurred at said crossing in which your petitioners' daughter, Imogene, and their other daughter, Helen, and two others narrowly escaped death, did the public, and especially L. D. McClung, learn that the said automatic signalling device was only constructed and hooked 'up' on one track, which was the middle track, though the signs on said posts or pillows read '5 Tracks' and '3 Tracks'.

"9. That on March 31, 1936, at the hour of about 8:30 P. M., petitioners' daughters, Imogene and Helen, in company with two young men, whose names were L. D. McClung and J. Warren Barbur, in an automobile, with L. D. McClung driving, and being accompanied on the front seat by petitioners' daughter, Imogene, and with the other two occupants on the back seat of said automobile, were traveling east on said highway and entered said crossing at a careful and prudent rate of speed; that at the time they entered said crossing it was dark, the bells on the said signalling device were silent and its lights not illuminated, no whistle was blown, no noise was made and no bell was rung, and apparently the crossing was clear and safe; that L. D. McClung, being cognizant of these facts, proceeded straight across said crossing until he reached a point a few feet from the fourth track from the west on said crossing, when he noticed that the crossing was blocked by an unloaded string of flat cars being pushed south across said crossing and having a dull drab color that blended with the color of the pavement which together with the narrowness of the said unloaded flat cars and the grade, made them almost non-apparent; that at this point said L. D. McClung swerved said automobile to the left and then crashed into the said string of flat cars; that in said crash the said automobile was almost completely demolished; that petitioners' daughter, Imogene, received cuts, bruises, broken bones and shock that caused her death within a few hours and the other three occupants of the car narrowly escaped death; that it was at this point and not until this time did the public and especially L. D. McClung learn that the automatic signalling device was only 'hooked up' on one track and this information was received only through the medium of a 'whispering campaign' carried on by the agents and employees of the said Railway Company."

Several different acts and elements of negligence on defendant's behalf alleged to be the proximate cause of the accident are specifically assigned. We conclude from plaintiffs' brief that all of these have been abandoned, except those which relate to the automatic signaling device. The gravamen of these is that this device, erected and constructed in the manner described in the petition, was misleading to the public, including plaintiffs' daughter and the operator of the car in which she was riding, and lulled them into the belief, on which they acted, that since, at the time of the accident, the lights of the device were not flashing and the gong not sounding, the intersection was clear of railway cars and free of danger from this source.

Defendant supports its exceptions by argument along these lines:

1. That the petition does not disclose any negligence on its part as a proximate cause of the accident; and, alternatively,

2. That the negligence of the operator of the car, in that he heedlessly drove it into the intersection at a rapid speed, contributed to the accident; and

3. That his contributory negligence is imputable to decedent or that she was guilty of negligence of an independent character, and, in either event, there can be no recovery.

The jurisprudence of this state is without a precedent to guide us in a determination of the very interesting proposition squarely presented in the case. It is conceded by plaintiffs' candid and energetic counsel that when defendant complied with Act No. 12 of 1924 by erecting "Stop" signs on either side of its line of tracks, no further obligation rested upon it to warn motorists of the presence of the tracks and of the possible danger of injury from passing trains, unless at the crossing there were extant such unusual and dangerous conditions as to require in law the adoption of other precautionary measures for the protection of persons using the intersection. He does not challenge the soundness of the general rule that the presence of a train in an intersection is a sufficient and a most impressive notice to the public that the crossing is

not then open to traffic, unless the surrounding conditions are such as to demand that unusual precautionary measures be there employed for the public's protection. But he argues, and forcefully so, that defendant itself recognized that this crossing is an uncommonly dangerous and hazardous one by the erection and operation of the signal devices which it was not required by positive law to do; and, having done so, impliedly extended an invitation to the public to enter and cross the intersection with a feeling of perfect safety when the signals were not functioning. It is affirmatively alleged that neither the deceased nor the operator of the ill-fated car knew that these signal devices would only sound and flash warnings when a train is approaching the intersection via the main track, or when a train has actually pre-empted the intersection via the main track. It is also alleged that this intersection is a part of defendant's yards. It is not unreasonable to assume that the switch and house tracks are daily used much more than the main line, especially at night, that is to say, many more trains pass over them daily than over the main line. These conclusions naturally lead to the assumption on the part of a motorist that if extra-precautionary methods were there adopted for the public's protection, such as the installation of signal devices, all tracks would be connected therewith so that the same warnings would be given regardless of which track the train is on.

The precise question here presented, so far as our research has extended, has not been passed on by the courts of the Union. Cases have been adjudicated wherein the negligence charged to railway companies consisted of the failure of signal devices to function as intended. In some of these cases it has been held, even where such devices were not required by law, that their failure to function was negligence per se and deemed to be the proximate cause of accidents resulting from collision between trains and automobiles, the drivers of which solely relied upon the signal devices for guidance into the intersection. Other cases hold that even where intersections are protected by signal devices, motorists are not warranted in solely depending upon them as affording a safeguide into the crossing, but require that the driver take heed of the fact that he is crossing railroad tracks, a place of danger. The failure to exercise such care, it has been frequently held, bars recovery. See Lindekugel v. Spokane P. & S. R. Co., 149 Or. 634, 42 P.(2d) 907, 99

A.L.R., 729; St. Louis-S. F. R. Co. v. Guthrie, 216 Ala. 613, 114 So. 215, 56 A.L.R. 1114; Crowley v. Chicago, B. & Q. R. Co., 204 Iowa, 1385, 213 N.W. 403, 53 A.L.R. 973, and Philadelphia & R. R. Co. v. Dillon, 1 W.W.Harr. (31 Del.) 247, 114 A. 62, 15 A.L.R. 901.

In Seelhorst et al. v. Ponchartrain Railroad Company, 11 La.App. 586, 587, 123 So. 626, the Orleans Court of Appeal, with Judge Higgins, now of the Supreme Court, as organ, as appears from the syllabus, held that:

"Pedestrian stopping at first track at city grade crossing, who saw that signals placed there for purpose of warning pedestrians were not working, had right to assume that there was no danger in attempting to cross, and was not guilty of contributory negligence as to injuries sustained from contact with train while crossing tracks; failure of warning signals to operate being invitation to cross."

We realize that the facts of the present case may easily be distinguished from those in the Seelhorst Case, but in some respects the cases are analogous. In that case the signal lights were not operating at all, as found by the court, while in the case at bar the lights and gong would not operate unless the train was on the main track. However, if the mechanical and electrical set-up of the signal devices in the present case was so arranged as to mislead and misguide those driving over the intersection at night, without knowledge of the limitations within which the devices operated as warnings, it is not improbable that the defendant by so doing has rendered itself responsible in damages due to such facts.

■ If we should assume that the driver of the car was negligent in not stopping and looking before attempting to cross the intersection, it does not necessarily follow that such negligence may be imputed to decedent. It would not necessarily follow that she may be properly charged with independent negligence of a type to bar recovery, as was found and held in the Lockhart Case (La. App.) 153 So. 577. Many facts affecting the question may be injected into it. Each case of this character depends for determination upon its own peculiar facts.

■ The petition in this case does not clearly disclose lack of right or cause of action in plaintiffs, and this being true, doubts thereon should be resolved in favor of the sufficiency of the petition. In so

holding, it is not our purpose to prejudge the case on its merits to any extent.

For the reasons herein assigned, the judgment of the lower court is reversed and set aside and this cause remanded to the lower court for further proceedings; costs of appeal are assessed against defendant.