**SQUYRES v. BALDWIN et al.**

No. 5586.

Court of Appeal of Louisiana. Second Circuit.

Jan. 28, 1938.

Rehearing Denied April 1, 1938.

Writ of Certiorari and Review Granted May 30, 1938.

Ward T. Jones and Cleveland Dear, both of Alexandria, for appellant.

Hudson, Potts, Bernstein & Snellings, of Monroe, and Hawthorn, Stafford & Pitts, of Alexandria, for appellees.

HAMITER, Judge.

An automobile driven by one Richard A. Johnson collided with a gravel car, which was a part of a moving train, at a switch or spur track crossing near the town of Woodworth, in Rapides Parish, Louisiana. Squyres, a passenger in the automobile, received injuries in the collision, and he brought this suit to recover damages therefor.

The defendants named in the initial pleading were L. W. Baldwin and Guy A. Thompson, Trustees named and qualified in the reorganization proceedings, conducted under the national Bankruptcy Act, of the Missouri Pacific Railroad Company, to whom the train belonged. A showing having been made by L. W. Baldwin that he had resigned his trusteeship, the suit as to him was dismissed by consent of counsel. It was carried on against the remaining Trustee.

For convenience, the Missouri Pacific Railroad Company will be referred to and considered in this opinion as the defendant.

The petition alleges numerous facts to support plaintiff's charge that defendant and its employees were not taking proper precautions in the operation of the train at the railroad crossing, and that this failure constituted negligence which was the proximate cause of the accident.

Defendant excepted to the petition as disclosing no cause and no right of action. On these exceptions being overruled, answer was filed in which defendant denies liability and negligence on its part. In the alternative, contributory negligence is attributed to plaintiff.

A trial on the merits was had, after which there was judgment rejecting plaintiff's demands. He appealed devolutively.

The exceptions of no cause and no right of action are reurged in this court. The petition sufficiently alleges all of the facts that were developed on the trial of the merits; and for the reasons hereinafter given in connection with our discussion of the merits of the case, we think that the exceptions were properly overruled.

It is our purpose in this opinion to first recite the facts of primary importance involved in the litigation, as we find them, and then discuss, in the order listed, (1) the alleged negligence of defendant and its employees, and (2) the charge of contributory negligence on the part of plaintiff.

At the time of the accident both plaintiff and the driver of the automobile, Johnson, were domiciled in the town of Melder, in the southern part of Rapides Parish, Louisiana. Plaintiff worked for the Weaver Brothers Lumber Company at Weaver's Station, located a considerable distance north of Alexandria, Louisiana, and he made occasional week-end visits to his domicile. Two weeks prior to January 18, 1936, while plaintiff was in Melder, he learned that Johnson would be in the city of Alexandria with his car on the night of the named date. Thereupon he informed the latter of his intention to return to his home on that night and requested permission to ride in the automobile from said city. This request was granted. It was agreed that the gas and oil necessary for the trip would be paid by plaintiff, Squyres.

At about 9:40 o'clock on the night of Saturday, January 18, 1936, plaintiff reached Alexandria by train from his place of employment and was met at the railroad station by Johnson. Both entered the automobile and proceeded upon their journey toward Melder with Johnson driving. The route selected was south on U. S. highway 165 through Woodworth to Forest Hill, this being a paved highway and used by traffic traveling from Alexandria to Lake Charles, Louisiana, and to Beaumont and Houston, Texas; thence on a graveled road from Forest Hill to the domicile of the parties.

It was snowing lightly while they were in and leaving Alexandria. After having traveled about three miles from the corporate limits of that city, the snow increased in volume and density and later became so thick and heavy that driving was rendered difficult. During the heaviest part of the snow storm Johnson had a clear vision in front of him, with the aid of the car's two headlights which were in perfect order and burning, of only 25 or 30 feet. However, the lights of approaching vehicles could be seen by him at a distance of about 100 feet. The night was extremely dark.

The first stop in the journey was made in the town of Woodworth, Louisiana, at a closed service station, where the snow and ice were cleared from the windshield of the car. A distance of eleven miles had been traversed, and the time consumed in traveling it was approximately one hour. The cleaning process required a few minutes, during which period the parties discussed the advisability of remaining there or proceeding to their respective homes, situated about 12 or 14 miles away. The latter course was adopted because of the cold weather that then existed and the fact that there was no available building in Woodworth to shelter them during the remainder of the night.

The automobile was again entered and the trip toward the south resumed. The dense and unusually heavy snow continued to fall and the ground in that vicinity was blanketed with it. Furrows appeared in that portion of it which lay on the highway, these having been made by vehicles. a strong wind was blowing from the north. Johnson occupied the driver's seat, while plaintiff sat at his right and held an overcoat over the window of the car's right door, the glass of which had previously been broken, to prevent the entrance of the snow and cold. Shortly after the resumption of the journey, the windshield and its attached wiper became burdened with snow and unusable, so Johnson lowered the win-

dow on his side and drove with his head protruding from the car. A distance of approximately one-fourth of a mile had been negotiated when the driver observed a low, black gravel car obstructing the highway. At that time, he was driving at a speed of from 12 to 15 miles per hour. His brakes, which were in good condition, were immediately applied; but the intervening distance was too short to permit a stopping of the automobile before the occurrence of a collision. The movement of the train was responsible for the dragging of the automobile off the highway, after the impact, and its turning over.

U. S. highway 165, at and near the place of accident, runs generally in a north and south direction, and is straight on each side of the crossing for some distance. There are no buildings, trees or other view-obstructing agencies on either side of the road in that immediate vicinity. The usual "Louisiana Law Stop" signs and small highway markers inform of the presence of the spur track. Defendant's main line tracks are located several hundred yards east of and parallel with the highway.

Branching from the main line, the spur track travels in a southerly direction and then curves toward the west and courses diagonally and southwesterly across the paved highway at grade or level therewith. It is employed solely for and in the interest of the Alexandria Gravel Company. The frequency of its use depends upon the volume of business enjoyed by that company in connection with the operation of its gravel pit located west of the highway. At and about the time of the accident, it was being employed frequently.

Johnson, the automobile driver, knew that a railroad crossing existed in the vicinity of Woodworth, but he did not know its exact location. Occasional trips had been made by him over the highway during a period of five years; however, he had never seen a train on the spur track before, and was of the impression it was not used.

Defendant's train, when struck by the automobile, consisted of 15 low gravel cars and the engine. Six employees were in charge of it, these being an engineer, fireman, conductor and three brakemen. The engine was equipped with electric headlights on both its front and rear, and these were burning. Operating signals were given by the brakemen to the fireman and the engineer from the rear of the train by means of electric lanterns.

On the night in question, the train was backed from defendant's main line onto and along the spur track, and several cars were coupled to it before the highway crossing was reached. The backing was then continued across the highway where switching operations were performed in the vicinity of the gravel pit. In order that a car might be secured from a side spur track, it was necessary that the train be moved forward and then backward. Accordingly, the proceed signal was given by a brakeman. While the train was traveling forward at a speed of about four miles per hour, preparatory to the later backward movement, the collision resulted. At that time the highway practically divided the train, the car which was struck being the eighth behind the engine. The engine's emergency brakes were immediately thereafter applied, and a stop was effected. The highway was never free from obstruction from the moment the train backed across it until the impact occurred, a period of approximately five minutes; and further obstruction was intended and necessary by reason of the contemplated additional backing. The whistle and bell of the engine were frequently sounded during the course of the switching operations. No flagman or lights were stationed at the crossing to warn approaching motorists that it was occupied.

The general rule of law pertaining to the subject under consideration appears to be that ordinarily the presence of a train across a public highway for a reasonable length of time constitutes suitable and sufficient warning that the crossing is being used and is not then available to highway traffic; and no further or additional notice or warning by signals, signs, or otherwise, need be given by its operators. An exception to that rule is, however, that where conditions and circumstances surrounding the crossing are such that the employees in charge of the train, in the exercise of reasonable care, ought to know that because of said conditions and circumstances the cars upon the crossing constitute such an obstruction that people traveling along the highway in automobiles properly equipped with lights and carefully operated at a reasonable rate of speed will likely come into collision with them, suitable and appropriate warning must be given by said employees. Plummer v. Gulf-M. & N. R. Company, La.App., 153 So. 322; Patterson v. Chicago R. I. &

P. Railroad Company, La.App., 175 So. 164; Aaron v. Martin, La.App., 172 So. 840; Richard v. Maine Central Railroad Company, 132 Me. 197, 168 A. 811; Gage v. B. & M. Railroad Company, 77 N.H. 289, 90 A. 855, L.R.A.1915A, 363; Gulf M. & N. R. Company v. Kennard, 164 Miss. 380, 145 So. 110; St. Louis & San Francisco Railway Company v. Gutherie, 216 Ala. 613, 114 So. 215, 56 A.L.R. 1110; Gulf M. & N. R. Company v. Holifield, 152 Miss. 674, 120 So. 750; Huddy's Encyclopedia of Automobile Law, 9th Ed., Vol. 7, 8, pages 129, 130.

Of course, the foregoing exception to the general rule is applicable only in the event that the employees possess sufficient time to provide the required warning. Yardley v. Rutland Railroad Company, 103 Vt. 182, 153 A. 195.

As was stated in Richard v. Maine Central Railroad Company, supra (168 A. page 813), whether "the occupation of the railroad crossing without a warning to travelers was reasonable depended upon a number of factors, the length of time that the train remained standing and the opportunity thus given the trainmen to display warning signals or to uncouple the train, the visibility, atmospheric conditions, the purpose for which the train stopped, and doubtless others."

■ Viewing the facts of this case in the light of the principles of law which we have just announced, it is our opinion that defendant's employees were negligent in the conducting of their switching operations· at the crossing and that their negligence was a proximate cause of the collision and, plaintiff's injuries.

The falling snow was unusually heavy and dense, the ground and concrete pavement were covered with it, and the night was dark; all to the knowledge of the trainmen. U. S. highway 165 accommodates many travelers, as it is a main artery of traffic in the State highway system, connecting central Louisiana with numerous points south and southwest thereof. The spur track is level with the pavement, while the railroad signs there located were, when the collision occurred, concealed by the falling snow. The track serves only one commercial interest, and of course is not used nearly so much as is the main line of defendant. The low, black gravel cars were rendered a dull gray color in appearance by reason of the snow which surrounded them.

It is true that the engine's bell and whistle were sounded at times during the operations; but Johnson and plaintiff testified that they heard no such signals, and their testimony is supported by the fact that a strong northerly wind was blowing which, according to a deduction that can reasonably be made, carried the sounds from them. According to the testimony of the operators of the engine, the rear electric light on that vehicle shone back over the low, gravel cars; and defendant's counsel argue that travelers on the highway should have observed them. It is possible that this light enabled the trainmen to see them, but failed to provide sufficient illumination for those using the public road. Then, too, the switching was being performed on a curved track, and it is very likely that because of this curve, the light, immediately preceding the moment of impact, was sending its rays in a southerly direction away from the gravel cars and the path on which plaintiff was journeying.

We are of the opinion that the weather conditions prevailing on the night of January 18, 1936, at and near the scene of the accident, together with the attendant circumstances above enumerated, were such as to require of the trainmen the taking of more than usual precautionary measures at the crossing, and bring the instant case within the above stated exception to the general rule. According to the evidence in the record, an electric lantern could be seen through the snow a distance of several hundred feet; and if a member of the train crew had been standing at the crossing with such a light, no doubt the collision would have been averted. Ample time for the giving of that or a similar warning was had by defendant's employees, and their failure in this respect constituted negligence and proximately caused the accident.

■ Consideration is now given to the question of whether or not there was negligence on plaintiff's part which contributed to and was a proximate cause of the accident. It is unnecessary for us to consider the negligence of the driver of the automobile, for his negligence, if any, was not imputable to plaintiff, unless at the time the two were engaged in that kind of joint enterprise or adventure in which such imputation is provided for by the law of negligence. Vitale v. Checker Cab Company,

166 La. 527, 117 So. 579, 59 A.L.R. 148; and cases therein cited.

■ However, we find in the instant case no joint adventure of the kind above suggested. For such to have existed, it was necessary for plaintiff to have an equal right with Johnson to control the operations of the car. Delaune v. Breaux, 174 La. 43, 139 So. 753; Barber v. El Dorado Lumber Company, La.App., 139 So. 29, and on rehearing La.App., 142 So. 718.

■ He did not have that right, and actually had no control whatsoever over the automobile. The car belonged exclusively to Johnson, and was being driven by him. The fact that a previous agreement had been entered into in which plaintiff was to pay for the gas and oil necessary for the trip did not change the latter's legal status. It was that of an invited guest.

■ Considering and treating plaintiff as a guest, was he guilty of independent negligence such as will bar his recovery herein? In the case of Mrs. Gladys Godwin Martin v. Yazoo & Miss. Railroad Company, General Accident & Fire Assurance Corporation, Limited, Intervenor, 181 So. 571, just considered by us and not yet reported [in State Reports], we had occasion to determine the legal duty of a guest passenger in an automobile when approaching a railroad crossing. In an elaborate opinion written in connection with that case by Judge Drew, the Presiding Judge of this court, numerous decisions of the courts of this and other states, together with extracts from a well-known text on automobile law, were referred to, and the confusion that exists in the jurisprudence of Louisiana on the matter presently considered was pointed out. After making those references, the opinion lays down the following rule which we deem applicable to the instant case:

"We are of the opinion that it is the independent duty of a passenger or guest when the vehicle in which he is riding is about to traverse a railroad crossing, to use ordinary, reasonable care for his own safety; that the care and precaution required of him is not as great as is that required of his host, and that the passenger or guest has the right to rely upon the driver to take the necessary precautions for his own safety and his safety until such time as the guest or passenger realizes by observation or otherwise, ·or should have realized by the use of ordinary care, that the driver is oblivious of the perils and dangers ahead or that he is disregarding them. This is particularly true when the guest or passenger knows that the driver is familiar with the location and the hazards surrounding it. Until such time as the actions of the driver indicate negligence, and the passenger or guest by the exercise of ordinary care has or should have discovered the perils confronting him, he is under no duty to enter a protest."

■ When the facts of this case are considered in the light of the quoted rule, the conclusion is reached that plaintiff was not guilty of independent negligence which contributed to or proximately caused the collision. He had lived at Melder, Louisiana, for only about two years, and during that period had traveled U. S. highway 165 three or four times. The details of the road were not familiar to him. In making the trip to his home from Weaver Station, on many occasions he left the train at Boyce and did not pass through or near Woodworth. He knew that a crossing existed in the vicinity of that town, but was not sure of its exact location while driving. Then, too, he was aware that driving through this snow storm was dangerous, because a discussion about it was had with Johnson. On the other hand, however, it was necessary for the parties to either attempt to reach their homes, or spend the night in the automobile on the roadside and endure the cold weather. After deciding on the last alternative, Johnson drove his car cautiously and carefully at a rate of speed that was reasonable and proper under the circumstances. His braving of the elements by driving with his head out of the car window is evidence of the cautiousness pursued. There was nothing about the handling of the automobile to give plaintiff grounds for protest. A demand to the driver that the journey be terminated was in our opinion not required. The existence of the crossing was better known to Johnson than it was to his guest passenger, and there was no reason for the latter to inform of it. Plaintiff could see the lights of approaching automobiles, as he looked through the windshield, although he could not observe unlighted objects. He did not see the gravel car which obstructed the crossing. It was not encumbent on him to place his head outside the car; for no assistance could have been rendered the driver by his so doing. We think that plaintiff exercised the ordinary, rea-

sonable care for his own safety, under the prevailing circumstances, which the law required of him, and that there was no negligence on his part which bars recovery herein.

The collision rendered plaintiff unconscious, and he remained in that condition until his arrival at a hospital in Alexandria. There it was found that he had sustained a complete fracture of the left portion of the mandible, this being the horseshoe-shaped bone forming the lower jaw. The bone was entirely severed, and a space of one-eighth of an inch or more separated the two fragments. Also plaintiff sustained numerous cuts and lacerations about the face, particularly a cut that severed the middle septum of the nose and extended into the left cheek, and another that followed along the line of the lower jaw. All of these left permanent scars. Further, by reason of the accident, four teeth were lost to him and others were loosened, and he suffered a contusion to one of his legs.

Plaintiff was confined to his bed for about ten days and was under the care of a physician for six or seven weeks. During the first week after the accident, he experienced excruciating pain. Following this, for some time, he endured pain, but of a lesser degree. His extreme suffering was due principally to the nose and jaw injuries. It is generally recognized that the nose is one of the most sensitive organs of the anatomy, and usually a blow thereon produces considerable pain. The injury to plaintiff's nose required the suturing of its inside and outside. Then too it was bruised and this caused a swelling and the blocking of both passages, and for a number of days plaintiff was compelled to breathe entirely through his mouth. The breaking of the mandible caused a tearing and mangling of his gums, with resultant hemorrhages; and the extraction of his teeth without an anesthetic, but with extreme pain to him, was necessary.

At the time of trial plaintiff complained of a numbness in part of his face. According to his physician, this condition was due to the injuring of a nerve accompanying the breaking of the jawbone.

It is our opinion that plaintiff should be compensated for the physical injuries, suffering and disfigurement above described in the sum of Two Thousand ($2,000.00) Dollars. Taylor v. Shreveport Yellow Cabs, La.App., 163 So. 737.

The medical and hospital expense proved by him amounts to $65.50, to which he is entitled.

Accordingly the judgment of the trial court is reversed and set aside, and there is now judgment in plaintiff's favor and against defendant in the sum of $2065.50, with legal interest from judicial demand until paid, and all costs of this proceedings in both courts.